**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| L.B. and E.G., | : | Civil Action No.: 2: 26-cv-1470 |
| Plaintiffs, | : | |
| v. | : | |
| PITTSBURGH PUBLIC SCHOOL DISTRICT, | : | **FILED** |
| Defendant. | : | JUL 08 2026 |

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## COMPLAINT

Plaintiffs L.B., an adult student with a disability, and E.G., L.B.'s parent, file this Complaint pursuant to 20 U.S.C. § 1415(i)(2)(A), seeking judicial review of the Hearing Officer's Final Decision and Order, and allege as follows

### INTRODUCTION AND NATURE OF THE ACTION

1. Plaintiffs jointly file this civil action to appeal the administrative decision of a Pennsylvania Special Education Hearing Officer under the Individuals with Disabilities Education Act (IDEA).

2. In October 2025, the Defendant Pittsburgh Public School District ("District") issued L.B.'s Reevaluation Report, which included an Assistive Technology (AT) assessment.

3. Plaintiff E.G. disagreed with the District's reevaluation and requested an IEE at public expense.

4. The District refused to fund the requested IEE and initiated a due process hearing to defend the appropriateness of its reevaluation.

1

5. On April 13, 2026, the Hearing Officer concluded that the District's reevaluation was appropriate and denied the requested IEE. Plaintiffs seek judicial review of that decision and request that it be reversed.

## JURISDICTION AND VENUE

6. This action arises under IDEA 20 U.S.C. § 1400 et seq.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2)(A), which authorizes "[a]ny party aggrieved by the findings and decision" of a special education hearing officer to bring a civil action.

8. The claims in this appeal have been exhausted by a Pennsylvania Special Education Hearing Officer at the administrative level.

9. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the Defendant school district is located in this judicial district and the events giving rise to these claims occurred within this district.

## THE PARTIES

10. Plaintiff L.B. is an adult student with a disability who resides within the District. She is eligible for special education and related services under the IDEA and is receiving Extended School Year (ESY) services following her twelfth-grade school year. L.B. was a minor throughout the reevaluation, the request for the IEE, and the administrative due process proceedings giving rise to this appeal.

11. Plaintiff E.G. ("Parent") is L.B.'s parent and resides within the District. Parent requested the IEE at public expense, participated pro se throughout the administrative proceedings, and is aggrieved by the Hearing Officer's decision denying the requested IEE.

12. Defendant Pittsburgh Public School District is a local educational agency responsible for providing L.B. with a free appropriate public education (FAPE) under the IDEA.

## FACTUAL BACKGROUND

**L.B.'s Disabilities and Educational Needs**

13. L.B. is eligible for special education and related services under the IDEA under the categories of Other Health Impairment, Emotional Disturbance, and Autism.

14. L.B. is identified as a gifted student under 22 Pa. Code Chapter 16 and, at all times relevant to this dispute, her Individualized Education Plan (IEP) had Specially Designed Instruction (SDI) for both special education and gifted goals.

15. L.B.'s disability-related needs include medical access, visual access, executive functioning, social communication, social-emotional functioning, and sensory regulation.

16. L.B. has Postural Orthostatic Tachycardia Syndrome (POTS), a chronic illness that causes fatigue, heat intolerance, nausea, tremors, and presyncope/syncope risk. Her condition necessitates limiting standing to no more than 3 to 5 minutes, and further restricts walking and sitting upright during periods of overexertion and symptom flares.

17. Before the onset of significant POTS symptoms, L.B. completed advanced mathematics several years ahead of grade level.

18. L.B. has Binocular Vision Disorder, Oculomotor Syndrome, and Accommodation Insufficiency, which impair her visual efficiency and visual processing and cause blurred and double vision, errors when copying notes, poor visual attention, headaches, and difficulty completing assignments.

19. L.B. experiences severe nausea, headaches, and motion-sickness symptoms when shifting her gaze between different visual planes and focal distances, specifically when looking

back and forth between a computer screen and paper materials, or between a classroom board and her desk.

20. After 10 to 15 minutes of reading or engaging in tasks across multiple surfaces, L.B. becomes physically ill and requires several hours of rest before she can resume her educational work.

21. L.B.'s disabilities substantially impair her ability to independently access instruction, complete academic work, and participate in her educational program.

**Access to Instruction During Medical Absences**

22. L.B.'s symptoms affect her school attendance and her access to general education classes, special education instruction, related services, and other school programming.

23. District documents describe L.B.'s medical needs as her 'biggest barrier' to education. Her absences were found to be "strongly linked to physical health" rather than work avoidance.

24. Attendance records documented numerous disability-related absences and early dismissals during the 2024–2025 school year but did not capture L.B.'s full loss of instructional access when she remained in the school building, resting on a wedge pillow on the floor of the resource room during symptomatic episodes.

25. Despite periods of improved health during the spring of 2025, L.B. continued to experience significant barriers to accessing classroom instruction.

26. Nine days before Parent consented to the October 2025 reevaluation, the District issued a Notice of Recommended Educational Placement/Prior Written Notice (NOREP/PWN), acknowledging that L.B. was experiencing "difficulty... receiving consistent instruction" and identifying "access to instruction (attendance)" as an educational concern.

4

**Documented Functional Needs**

27. A reevaluation report from January 2025 documented L.B.'s executive-function weaknesses, attentional difficulties, anxiety, and POTS-related barriers to school participation and instruction.

28. The District's January 2025 Functional Behavior Assessment (FBA) found that L.B.'s absences from class were correlated with her medical diagnosis rather than behavioral noncompliance.

29. The January 2025 IEP documented the team's conclusion that encouraging attendance could "backfire" by increasing L.B.'s POTS symptoms and causing her to miss even more classes.

30. Instead, the IEP team adopted a Positive Behavior Support Plan that prioritized teaching independent self-management and organizational skills as replacement behaviors to reduce the anxiety and avoidance associated with falling behind in coursework.

31. The January 2025 Reevaluation Report recognized that L.B. needed organizational systems she could independently use across settings.

32. The January 2025 Reevaluation Report recommended transitioning L.B. to a more self-initiated organizational system to increase her independence and develop skills necessary for post-secondary settings.

33. The January 2025 IEP and FBA likewise identified task initiation, planning, organization, and independent task management as areas of need.

34. Despite related goals and SDI, District records and testimony documented that L.B. remained extensively dependent on adult prompting and support to manage assignments and organizational tasks.

35. L.B. also required extensive adult support and intervention for her writing assignments.

36. The January 2025 Reevaluation Report observed that although L.B. obtained Very Superior scores on standardized measures of writing, she continued to struggle with writing assignments. The Report concluded that her weakness was 'most likely attributed to performance deficits associated with anxiety, autism, and emotional disturbance and not a skill deficit.

37. Parent reported that L.B. had not independently written an essay since approximately fifth or sixth grade.

38. Parent reported that L.B. required intensive one-to-one assistance to make choices, initiate writing tasks, and talk through essays with an adult acting as a scribe.

39. Although L.B. had IEP goals and SDI addressing writing and decision-making, no progress was reported during the second semester of the 2024-2025 school year because L.B. dropped English due to her health and the District concluded that assigning additional writing would increase her anxiety.

40. L.B.'s disability-related absences impaired her ability to participate in and benefit from her educational program.

41. L.B.'s cardiologist recommended that she be permitted to access classes virtually or through recordings during disability-related absences.

42. Before requesting the comprehensive AT reevaluation in the spring of 2025, Parent sought technological methods of providing educational access during disability-related absences.

43. The Parent and District discussed potential technologies including telepresence, live-streaming, recordings of missed classes, and later artificial intelligence (AI) transcription.

44. The District responded by expressing concerns regarding implementation, operational readiness, and L.B.'s ability to tolerate particular technologies.

45. No functional trials were conducted to determine whether any technology could effectively address L.B.'s disability-related barriers.

**The Parent's Request for Reevaluation (Spring/Summer 2025)**

46. In May and again in July 2025, just prior to L.B.'s 12th-grade year, the Parent requested a comprehensive Assistive Technology reevaluation to identify the technology or combination of technologies that would reduce L.B.'s dependence on adult support and promote the independence necessary for postsecondary education.

47. Parent requested that the District evaluate whether assistive technology could address L.B.'s functional needs in the areas of organization, writing, and access to instruction and other educational activities during disability-related absences.

48. Parent explained that L.B.'s energy cost associated with using her existing organizational systems and assistive technology was medically unsustainable given her POTS and visual impairments.

49. Parent expressly stated that she remained open to the District's recommendations and "other tools deemed appropriate through collaborative input."

50. In response, the District issued a Prior Written Notice (PWN) and Permission to Reevaluate (PTR) agreeing to conduct the comprehensive Assistive Technology reevaluation.

51. The District's PWN stated that the reevaluation would determine whether L.B.'s current assistive technology remained appropriate and effective or whether new or different assistive technology was needed to support her educational progress and access to the curriculum, noting that "per parent report, her needs have changed prompting the need for further assessment."

52. The Parent also requested that the evaluation include a collaborative, data-driven review of prior organizational and writing interventions, provided the District with a comprehensive list of previously attempted strategies, and invited the evaluation team to determine what strategies had been implemented, which had been effective, and what additional supports should be considered.

53. During the consent process, the District represented that the AT assessment would be conducted using the Pennsylvania Training and Technical Assistance Network (PaTTAN) Evidence-Based Practices for AT Decision Making and the Wisconsin Assistive Technology Initiative (WATI) Assessing Student Needs for Assistive Technology (ASNAT) protocol.

54. On September 3, 2025, the Parent signed the PTR.

55. The finalized PTR specified that the evaluation scope would include:

- A records review of L.B.'s most recent Reevaluation Report and IEP;
- A review of L.B.'s progress reports and current AT plan;
- Observations and the collection of Parent, Teacher, and Student input.
- An Assistive Technology assessment

**The October 2025 Reevaluation Report and Assistive Technology Assessment**

56. On October 21, 2025, the District issued its Reevaluation Report (RR), which included an Assistive Technology Assessment.

57. The October 2025 RR omitted multiple categories of evaluative information relevant to L.B.'s assistive technology needs and relied on a methodology that differed from the evaluation process described in the PTR.

58. The RR contained no student input.

59. The RR contained no classroom observations.

60. The RR contained no teacher input from December 2024 through June 2025—the period immediately preceding the reevaluation request and encompassing significant changes in L.B.'s health, attendance, and educational functioning.

61. The RR omitted input from educators with direct responsibility for L.B.'s writing instruction and writing IEP goals, including her current English teacher and the special education teachers responsible for her writing instruction.

62. The RR omitted current evaluative input from the school psychologist, who provided weekly psychological related services to L.B.

63. The RR did not include the itinerant vision specialist's finding that L.B. becomes ill after 10 to 15 minutes of reading across multiple visual surfaces, relying instead on an earlier vision screening summary.

64. The methodology utilized in the October 2025 RR also differed from the evaluation process described in the PTR and represented to Parent.

65. The Permission to Reevaluate identified both review of the Assistive Technology Plan and an Assistive Technology Assessment as separate sources of evaluation data.

9

66. The October 2025 RR included a summary of L.B.'s existing AT Plan but contained no functional assistive technology assessment data.

67. The District later testified that the Feature Match was limited to L.B.'s current IEP and current educational placement and did not evaluate potential future needs.

68. The RR did not include that Feature Match table, which the District later testified it used to determine that L.B.'s assistive technology needs were met.

69. The RR included an AT Summary Plan prepared from a generic template developed for a third-grade student.

70. As a result, L.B., a high school senior enrolled in Advanced Placement courses, was identified as having elementary-level areas of need, including handwriting and spelling.

71. The RR relied on an undocumented survey of general education teachers. Based on that survey, the District determined that L.B. "actively uses" unspecified assistive technology tools and concluded that "no additional supports or equipment are needed to address L.B.'s AT needs."

72. The survey did not identify whether L.B. used her AT tools in class, the frequency or location of any use, or the functional effectiveness of the tools.

73. The RR did not evaluate whether L.B.'s current IEP, including its SDI and assistive technology supports, provided effective and independent access to instruction.

74. The RR did not evaluate whether assistive technology could reduce L.B.'s dependence on adult assistance for writing, organization, and executive functioning.

75. The RR did not evaluate barriers to the use of assistive technology tools.

76. The RR did not evaluate whether L.B. had access to the identified assistive technology tools, whether the tools were compatible with her primary school-issued device, or whether she could use the tools independently.

77. The RR did not evaluate, through functional trials, whether assistive technology increased L.B.'s independence.

78. The RR did not evaluate L.B.'s assistive technology needs in her customary environments, including when absent from school because of her disability or when required to recline because of POTS symptoms.

79. The RR nevertheless concluded that no additional assistive technology supports or equipment were needed.

**Evaluation of Instructional Access Needs**

80. The October 2025 RR did not evaluate whether L.B. required new or different assistive technology or other supports to access instruction during disability-related absences.

81. Parent requested that the evaluation consider technological methods of providing access to instruction and other educational activities during disability-related absences and reiterated that she remained open to any technology addressing L.B.'s educational needs.

82. During the reevaluation process, Parent sought clarification regarding the evaluation timeline, whether the reevaluation would include functional assistive technology trials, and how it would address L.B.'s access to instruction during disability-related absences.

83. The District responded that its objective was to complete a thorough and comprehensive reevaluation addressing L.B.'s needs.

84. The RR did not evaluate whether L.B.'s disability-related absences created barriers to accessing classroom instruction.

85. The RR nevertheless concluded that no additional assistive technology supports or equipment were needed.

**Selective Characterization and Omission of Evaluation Data**

86. The October 2025 RR selectively summarized the January 2025 AIR Self-Determination Scale (AIR-SDS), a transition assessment measuring L.B.'s self-determination.

87. The January 2025 assessment separately evaluated L.B.'s capacity for self-determination and her opportunities to exercise those skills at school and home and identified a discrepancy between the two.

88. Based on those findings, the January 2025 RR recommended increasing L.B.'s opportunities for self-determination and participation in educational planning.

89. The October 2025 RR, however, reported only the overall self-determination scores and omitted the separate capacity and opportunity findings and the related recommendations.

90. The January 2025 FBA determined that L.B.'s absences were correlated with her medical diagnosis.

91. The January 31, 2025 IEP determined that pressuring L.B. to attend class could exacerbate her POTS symptoms.

92. Despite that finding, the October 2025 RR characterized L.B. 's difficulty completing work as postponement of academic tasks.

93. During the due process hearing, District witnesses testified that L.B.'s inconsistent use of assistive technology reflected behavioral avoidance rather than disability-related barriers affecting her use of the tools.

94. The case manager, however, acknowledged that L.B. often forgot where assistive technology tools were located if she did not use them regularly.

12

95. The case manager further acknowledged that she could not determine whether L.B.'s inconsistent use reflected behavioral or physical causes.

96. The RR nevertheless did not evaluate whether executive-function deficits, visual deficits, medical limitations, or other disability-related factors contributed to L.B.'s inconsistent use of assistive technology.

## ADMINISTRATIVE PROCEEDINGS

**The Due Process Hearing**

97. The administrative due process hearing was conducted over two sessions on February 13, 2026, and March 13, 2026.

98. L.B. testified that the October 2025 Reevaluation Report failed to evaluate her actual assistive technology needs, that she was unfamiliar with several tools identified in the RR, and that other listed tools were unavailable on her primary school-issued device.

99. L.B. testified that she sought assistive technology that would allow her to independently access instruction, organize assignments, and complete schoolwork during disability-related absences without continued reliance on adult assistance.

100. District witnesses acknowledged that L.B. currently relied on extensive adult support for executive functioning and that comparable support would not be available in college.

101. L.B. further testified that when absent because of her disability she often did not know what had been taught in class because teacher-provided PowerPoint slides lacked the instructional content of classroom lectures.

102. Parent testified that, because the District did not provide an effective means for L.B. to access missed instruction, Parent routinely created podcasts and other instructional materials from the District's course materials using external AI tools.

103.    During the due process hearing, Parent sought to introduce an independent assistive technology evaluation performed by the UPMC Center for Assistive Technology. Parent offered the evaluation to compare the District's assistive technology methodology with an independent assistive technology evaluation, to question why additional assistive technology options had not been considered, and to demonstrate the reasonableness of the October 2025 Reevaluation Report.

104.    The Hearing Officer excluded the evaluation after concluding that evidence created after issuance of the October 2025 Reevaluation Report was not relevant to its appropriateness.

105.    Parent also sought to introduce documentary evidence concerning the District's temporary provision of French tutoring following disability-related absences. Parent offered the evidence to demonstrate the District's knowledge of L.B. 's disability-related barriers to accessing instruction and the need to evaluate assistive technology addressing instructional access during disability-related absences.

106.    The Hearing Officer excluded the evidence after concluding that it concerned educational programming rather than the appropriateness of the October 2025 Reevaluation Report.

**The Hearing Officer's Decision**

107.    On April 13, 2026, Hearing Officer Savannah Murphy issued a Final Decision and Order concluding that the District's October 21, 2025 Reevaluation Report was legally appropriate and denying Parent's request for an Independent Educational Evaluation at public expense.

108.    In reaching that decision, the Hearing Officer concluded that the October 2025 Reevaluation Report should be analyzed together with the January 2025 Reevaluation Report because information gathered in the January evaluation informed the October reevaluation.

109.    The Hearing Officer further concluded that the District had identified all areas of suspected disability through appropriate assessment methods and that the October 2025 Reevaluation Report constituted a comprehensive evaluation under the IDEA.

110.    The Hearing Officer concluded that the October 2025 Reevaluation Report reflected the District's long-standing process of assessing and addressing L.B.'s needs through ongoing consultation, monitoring, and collaboration with the IEP team, and relied on that process in concluding that the reevaluation was appropriate.

111.    The Hearing Officer further concluded that the District's use of the SETT framework, Feature Match, and ongoing consultation constituted an appropriate methodology for evaluating L.B.'s assistive technology needs.

112.    The Hearing Officer concluded that L.B.'s attendance, rather than her access to instruction when absent, was the relevant educational need to be addressed in her programming. The Hearing Officer further concluded that the appropriateness of her educational programming was an issue beyond the scope of the proceeding.

**Claims of Errors**

113.    The Hearing Officer erred in concluding that the October 21, 2025 Reevaluation Report constituted a comprehensive, individualized, and technically sound reevaluation under IDEA.

15

114. The Hearing Officer erred by concluding that the October 2025 Reevaluation Report could be evaluated in conjunction with the January 2025 Reevaluation Report rather than on its own merits.

115. The Hearing Officer erred by relying on information outside the written Reevaluation Report—including the District's historical knowledge, ongoing consultative process, and post hoc hearing testimony—to conclude that the October 2025 Reevaluation Report constituted a legally sufficient reevaluation under the IDEA.

116. The Hearing Officer applied an incorrect legal standard by concluding that the District's ongoing process of closely monitoring L.B 's needs and responding in "real-time" could substitute for a comprehensive evaluation under the IDEA.

117. The Hearing Officer erred by concluding that the Reevaluation Report was appropriate despite explicitly finding that the District omitted student input from its assistive technology evaluation.

118. The Hearing Officer erred by concluding that the District employed an appropriate evaluation methodology under the IDEA.

119. The Hearing Officer erred by concluding that the District identified all areas of suspected disability despite the Reevaluation Report's failure to evaluate multiple identified functional needs.

120. The Hearing Officer erred by treating disability-related barriers to accessing instruction as matters of educational programming rather than components of an appropriate assistive technology evaluation.

121.    The Hearing Officer applied the wrong standard by evaluating whether the District engaged in evaluative activities rather than whether the written Reevaluation Report was legally appropriate under the IDEA..

122.    The Hearing Officer erred by excluding relevant evidence bearing on the appropriateness of the October 2025 Reevaluation Report.

REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A.  Reverse and vacate the April 13, 2026 Final Decision and Order of the Special Education Hearing Officer;

B.  Declare that the Hearing Officer erred as a matter of law and fact in concluding that the District's October 2025 Reevaluation Report was appropriate under the IDEA;

C.  Declare that the District failed to prove that its October 2025 Reevaluation Report was comprehensive, individualized, and legally appropriate under the IDEA;

D.  Order the District to fund a comprehensive independent educational evaluation at public expense, conducted by a qualified independent evaluator of Plaintiff's choosing, including an independent assistive-technology, organizational, and functional evaluation, tailored to assess L.B.'s disability-related educational needs;

E.  Declare that Parent preserves all rights to utilize the findings of the ordered IEE to seek compensatory education, transition services, assistive technology supports, or other equitable remedies for any denial of FAPE resulting from the District's inappropriate evaluation;

F. In the alternative, remand the matter for further administrative proceedings consistent with the Court's ruling; and

G. Award Plaintiffs their costs and any other relief the Court deems just and proper.


July 7, 2026                              Respectfully submitted,

                                         *LB*

                                         L.B., Plaintiff Pro Se

                                         *EG*

                                         E.G., Plaintiff Pro Se

                                         Mailing Address for Plaintiffs:
                                         Attn: L.B. / E.G. Mail Bin
                                         7211 Thomas Blvd
                                         Pittsburgh, PA 15208
                                         412-404-3705
                                         proselitigant89@gmail.com